1
2
3
4              UNITED STATES DISTRICT COURT
5            NORTHERN DISTRICT OF CALIFORNIA
6

7    ROBERT BARROCA, et al.,                    Case No.  25-cv-00440-EMC
8                   Plaintiffs,
9          v.                                   **ORDER GRANTING IN PART
                                                MOTION TO DISMISS**
10   HAYWARD AREA RECREATION AND
     PARKS DISTRICT, et al.,                    Docket No. 95
11                 Defendants.
12

13         Plaintiff Robert Barroca, proceeding pro se, has sued the Hayward Area Recreation and

14   Parks District (HARD) as well as HARD rangers Ed Untalan, Dachineewan Oliver, Hillary

15   Fitzpatrick, and retired HARD employee Marco Hernandez, alleging failure to perform mandatory

16   duties under California law and numerous violations of the federal constitution, including the

17   Fourteenth, Fourth, and First Amendment.  Defendant HARD, on behalf of itself and its

18   employees, moves to dismiss all counts based on the California Tort Claims Act, qualified

19   immunity, and failure to state a claim.

20         For the reasons stated below, Plaintiff's claim under the Fourteenth Amendment for

21   Selective Enforcement against Defendant Fitzpatrick may proceed; HARD's motion to dismiss is

22   **DENIED** as to this count against this defendant.  Otherwise, HARD's motion to dismiss is

23   **GRANTED** on all counts and as to all defendants.

24         The Court also **DISMISSES** Plaintiff Gomes under Rule 41 and **STRIKES** Plaintiff

25   Barroca's claim against Officer Ghishan, which was improperly realleged after dismissal with

26   prejudice.

27
28

United States District Court
Northern District of California

## I.     **BACKGROUND**

### A.  Factual Background

Meek Park is a public park in Hayward, California, operated by HARD.  Dkt. No. 93, (SAC) ¶¶ 1-3.  In 2021, Plaintiff Robert Barroca's girlfriend Raelynn Gomes moved into a residence in Hayward, California that abuts Meek Park.  SAC ¶ 1.

In the summer of 2022, Plaintiff Barroca took over feeding a group of approximately twenty cats in the park.  *Id.* ¶ 21.  These cats were "not all feral but were actually neighborhood cats that Barroca had seen on doorsteps and in the front yards of neighboring houses."  *Id.*  He fed these cats every day twice a day.  *Id.*  Plaintiff was motivated to care for the cats by his catholic faith and the teachings of St. Francis of Assisi.  *Id.* ¶¶ 41-42 (Plaintiff "takes care of, feeds, shelters, provides medical needs, spay and neuters, play, love, and protected these cats" out of "love and faith from his own religious beliefs.")

Around the time that Plaintiff began to take care of the cats, Plaintiff became aware that many patrons of Meek Park walked their dogs off-leash.  *Id.* ¶ 23.  This concerned Plaintiff because off-leash dogs were prone to chasing cats and otherwise acting aggressively.  *Id.* ¶ 24, 25.  Plaintiff was himself bitten four times.  *Id.* ¶ 26, 37.  On many occasions, Plaintiff asked dog owners to put their dogs on leash but they frequently responded confrontationally.  *Id.* ¶ 26.  For example, one dog owner pulled a gun on Plaintiff after being asked to put his dog on a leash.  *Id.* ¶ 37.  Plaintiff started "video taping every single encounter."  *Id.* ¶ 26.  To date, Plaintiff has "over 2,700 videos and pictures, most of them of off-leash dogs."  *Id.*

HARD Ordinance 19(a) provides that "All pets shall be restrained at all times on a leash or device no more than 6 feet in length and under the complete control of the pets' owner or person in possession of the pet, except when in District designated off-leash areas."  *Id.* at Ex. B (HARD Ordinance No. 001-02 as amended 10/21/2019).  Plaintiff began to make frequent calls to the HARD park rangers to report these incidents of off-leash dogs.  *Id.* ¶ 27.  Between the summer of 2022 and 2023, Plaintiff called the rangers "hundreds of times."  *Id.* ¶ 38.  The rangers were "bothered by the amount of phone calls."  *Id.* ¶ 33.

When Plaintiff called in a complaint, the park rangers would typically either not show up

1    or show up a couple of hours after he called, by which time the off-leash owners had already left

2    the park. *Id.* ¶ 28, 38.  When Plaintiff asked the rangers why it was taking them so long to

3    respond, he was told that there were only five rangers for over 128 parks and that there was simply

4    not enough manpower to respond more quickly.  *Id.* ¶ 28.  However, Plaintiff often observed

5    HARD rangers in the park ignoring off-leash dogs. *Id.* ¶ 29.

6         Sometime in January, 2023, while feeding cats at the park, Plaintiff observed a group of

7    parkgoers drinking and playing loud music in the park.  *Id.* ¶ 30.  Plaintiff believed them to be in

8    violation of HARD Ordinances 16(a), 20(a), and 23(a), which prohibit consuming alcohol and

9    being unusually loud.  *Id.*; Ex. B.  Plaintiff got into an argument with one of these parkgoers, who

10   pulled a knife on him.  *Id.*  After this, Plaintiff left the park.  *Id.*

11        The next day, Defendant HARD Ranger Ed Untalen approached Plaintiff while he was

12   feeding the cats and told him that he had been dispatched due to a complaint about Plaintiff

13   feeding cats in the park.  *Id.* ¶ 31.  Ranger Untalan told Plaintiff not to feed the cats on district

14   property.  *Id.*  Plaintiff expressed his frustration to Ranger Untalan that "all of the hundreds of

15   times Barroca had called Rangers none ever came" to address his complaints of violations for

16   drinking alcohol, doing drugs, lighting fires, sleeping in the park, blasting music, and off-leash

17   dogs, but when there is a complaint about Plaintiff feeding the cats, a ranger "miraculously

18   appears."  *Id.* ¶ 31.

19        On April 9, 2023, Plaintiff observed Defendant Marco Hernandez having a family

20   barbecue in the park.  *Id.* ¶ 34.  Mr. Hernandez is a retired HARD employee who occupies the

21   caretaker's house in the park.  *Id.* ¶ 18.  Mr. Hernandez and Plaintiff had prior history: Mr.

22   Hernandez had previously confronted Plaintiff about his feeding of the cats, telling Plaintiff "You

23   feed those f-ken cats . . . fuck those cats, those cats shit in my yard."  *Id.* ¶ 22.  Plaintiff had

24   responded to this "angrily."  *Id.*

25        Mr. Hernandez' barbecue was located next to the caretaker's house in a public area of the

26   park.  *Id.* ¶ 34.  Plaintiff observed a fire and that alcohol was being served, which Plaintiff

27   believed to violate HARD Ordinances 18(a) and 16(a), which ban serving alcohol and open fires.

28   *Id.* ¶ 34; Ex. B.  Plaintiff walked over and began to film the barbecue from 150 yards away.  *Id.* ¶

United States District Court
Northern District of California

34. Ten minutes later, Defendant Ranger Dachineewan Oliver entered the park and spoke with Mr. Hernandez. *Id*. She then approached Plaintiff and questioned him on why he was video recording Mr. Hernandez. *Id.* Ranger Oliver ordered Plaintiff to stop filming. *Id.* ¶ 35. After Plaintiff refused, Ranger Oliver called the Alameda County Sheriffs. *Id.* ¶ 36. When four sheriffs deputies arrived, Ranger Oliver told them there had been an altercation. *Id.* Plaintiff does not allege that he was arrested or that the deputies took any further action. *Id.*

In the summer of 2023, HARD put up new signs in the park that read, "All Pets Must Be On A Leash, No Longer Than 6 Feet in Length" and "Feeding of Wild or Feral Animals Prohibited." *Id.* ¶ 39-40. Plaintiff believed that these new signs were posted because of Plaintiff's numerous complaints and his feeding of the neighborhood cats. *Id.* ¶ 41. Plaintiff maintains that the rule on feeding feral animals does not apply to his activities, because the cats he feeds are not feral, but are neighborhood cats. *Id.*

On August 31, 2023, Plaintiff was again feeding cats in the park. *Id.* ¶ 43. Defendant Thomas Vigil, a HARD maintenance employee, yelled at Plaintiff in "an aggressive and intimidating manner" to stop feeding the cats. *Id.* ¶ 44. Plaintiff began to videotape him. *Id.* A half hour later, Defendant HARD Ranger Hillary Fitzpatrick showed up. *Id.* ¶ 45.

Ranger Fitzpatrick cited Plaintiff for having his cats off leash in violation of Ordinance 19(a) and for feeding these cats in the park. *Id.* She said that Plaintiff had threatened her staff and instructed Plaintiff not to videotape anyone in the park without their consent. *Id.* Ranger Fitzpatrick then called the Alameda County Sheriff for back-up, stating that Plaintiff was not complying with her citation and was known to carry weapons. *Id.* Plaintiff was not carrying any weapons at this time. *Id.*

Plaintiff complied with the citation and informed Ranger Fitzpatrick that the house adjoining the park was his girlfriend's house, not his. *Id.* ¶ 46. When the Alameda County sheriff deputy arrived, Ranger Fitzpatrick told him that Plaintiff had threatened her staff. *Id.* Plaintiff disputed her characterization and showed the deputy his recording of his encounter with Mr. Vigil. *Id.* After viewing the recording, the deputy told Ranger Fitzpatrick that Plaintiff was not a threat. *Id.* When Plaintiff told the deputy that Ranger Fitzpatrick had instructed him that he could not

videotape people in the park without their consent, the deputy replied, "Yes, he can." *Id.* ¶ 47. A half hour after this incident, Plaintiff reported a large dog running off leash in the park, but no rangers showed up. *Id.* ¶ 49.

On September 11, 2023, Ranger Fitzpatrick again approached Plaintiff while he was in the park petting two cats. *Id.* ¶ 50. She told Plaintiff that he was the" only one in the park that wasn't compliant" with the leash ordinance and told him to feed the cats on his girlfriend's property. *Id.* ¶ 51. Plaintiff argued that the "all pets" language of the leash rule does not refer to cats, pointing out that the park sign pictures a dog and that some pets, like hamsters, cannot be put on a leash. *Id.* He also argued that his feeding the cats is no different than dog owners feeding their dogs. *Id.* ¶ 53. Plaintiff accused Ranger Fitzpatrick of harassing him because she favored Mr. Hernandez and of selectively enforcing the rules against him. *Id.* ¶ 52.

At this point, a dog owner in the park joined the conversation and began to argue with Plaintiff. *Id.* ¶ 53, 54. His dog was on a leash over 20 feet long. *Id.* ¶ 53. The dog owner and Plaintiff called each other names, after which the dog owner threatened to punch Plaintiff and break the phone he was using to record the incident. *Id.* ¶ 54. Ranger Fitzpatrick witnessed this but did not cite the dog owner either for having a leash more than 6 feet long or for threatening behavior in violation of HARD ordinance 20(a). *Id.* ¶ 55. When Plaintiff reported the dog owner afterward for the leash violation, Ranger Fitzpatrick stated that the leash was not longer than 6 feet. *Id.* ¶ 56. In the days following this incident, Plaintiff recorded video of multiple dogs running off-leash in the park, as well as rangers showing up at the park, witnessing the off-leash dogs, and doing nothing about them. *Id.* ¶ 60, 61.

On January 30, 2024, Plaintiff stabbed a man in Meek Park, for which he was arrested and prosecuted. *See* Dkt. No. 63 at 5; *see generally* 3:94-cr-00470-EMC-1 (Criminal Matter). Plaintiff claims that "HARD Rangers are supposed to search these areas specifically for homeless, criminals, people sleeping in the park, when they close the gates," and that "if defendant Ranger Oliver would have done her job and the mentally ill homeless man masturbating in the park wouldn't have been there, the incident would not have occurred." *Id.* ¶ 65.

After the stabbing incident, Plaintiff alleges that Ranger Oliver provided "false

information" to Plaintiff's probation officer that Plaintiff "lived at his girlfriend's house that bordered the park" despite knowing that Plaintiff actually lived at his sister's house. *Id.* ¶ 66, 75. Plaintiff alleges that the rangers knew his correct address because they had seen his driver's license and issued citations to Plaintiff using that address. *Id.* ¶ 66, 75; p.37, Claim 6. Plaintiff alleges this information led to the search of Ms. Gomes' house, which occurred on May 30, 2024. *Id.* ¶ 66, 79. Although Plaintiff characterizes this search as illegal and describes the circumstances behind it at length, the Court has previously dismissed with prejudice Plaintiff's Fourth Amendment claim regarding the search as barred by qualified immunity. *See* Dkt. No. 63.

On July 17, 2025, Plaintiff Gomes received a phone call from her property manager, Ron Smith. *Id.* ¶ 80. Mr. Smith informed her that he had received a call from an individual from HARD. *Id.* This unknown individual told Mr. Smith that Plaintiff "had created and was involved in multiple incidents in the Park that this person represented and was considered a nuisance." *Id.* at p.41, Claim 8. Mr. Smith then told Ms. Gomes that if the information was true and the behavior persisted, it "could affect her tenancy negatively, meaning that she could be evicted." *Id.* Mr. Smith "made clear that he was not filing an eviction at this time" but that it could be "a possibility in the future" and stated that "it would be a good idea if she [Ms. Gomez] restricted Mr. Barroca from visiting her." *Id.*

Plaintiff categorizes his claims by factual incident, rather than legal theory. The Court understands Plaintiff to assert the following claims: Breach of Mandatory Duties under California Code Section 815.6; Selective Enforcement in violation of the Fourteenth Amendment; First Amendment Retaliation; Free Exercise; Provision of False Information in violation of the Fourth Amendment; Fourth Amendment Search Violation.[1]

---

[1] Plaintiff also alleged a defamation claim that was stricken at Dkt. No. 121, as Plaintiff improperly realleged it after dismissal with prejudice. In addition, Plaintiff refers to the Fifth Amendment at times but states no facts upon which a Fifth Amendment claim could be based or any theory for such a claim. To the extent Plaintiff purports to assert a Fifth Amendment claim, it is dismissed with prejudice.

### B.  Procedural Background

Plaintiff filed his complaint on January 13, 2025 proceeding pro se and in forma pauperis. Dkt. No. 1.  On February, 2019, he amended his complaint.  Dkt. No. 12.  The Alameda County Defendants moved to dismiss the claims on March 12, 2025.  Dkt. No. 24.  Defendant Ghishan, Plaintiff's former probation officer, moved to dismiss on April 28, 2025.  Dkt. No. 35.  On August 1, 2025, the Court granted both motions to dismiss with prejudice.  Dkt. No. 63.

On September 2, 2025, Defendant HARD moved to dismiss.  Dkt. No. 77.  That same month, Plaintiff filed a motion for a TRO.  Dkt. No. 78.  The Court denied Plaintiff's motion for TRO and preliminary injunction.  Dkt. No. 85.  Plaintiff also sought leave to amend, which the Court granted.  Dkt. No. 78, 81.  The Court subsequently granted Plaintiff's request for an extension of time to file his second amended complaint.  Dkt. No. 92, 93.  On October 30, 2025, HARD brought the instant motion to dismiss the SAC.  Dkt. No. 95.  After requesting and receiving an extension of time from the Court, Plaintiff opposed.  Dkt. No. 105, 108.

On November 4, 2025, the Alameda County Defendants filed a motion to strike/dismiss the defamation claim that the Court had previously dismissed with prejudice.  Dkt. No. 97.  The Court granted this motion on January, 22.  Dkt. No. 121.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss on the ground that there is a "failure to state a claim upon which relief can be granted." A motion to dismiss should be granted if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).  The Court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The Court need not accept as true allegations that are legal conclusions, unwarranted deductions of fact or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, amended, 275 F.3d 1187 (9th Cir. 2001).  "A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers'" *Erickson*, 551 U.S. at 94.

## III.    DISCUSSION

### A.  Fed. R. Civ. P. Rule 8(a)

As a threshold matter, HARD seeks dismissal on Rule 8(a) grounds.  Rule 8 requires a plaintiff to provide a "short and plain statement of the claim showing that the pleader is entitled to relief."  The Ninth Circuit has upheld dismissal on Rule 8(a) grounds where a complaint consists of "narrative ramblings" and does "not provide defendants notice of what legal claims are asserted against which defendants."  *McHenry v. Renne*, 84 F.3d 1172, 1175-1176 (9th Cir. 1996).  Plaintiff's complaint here, while given to narrative asides, does provide concrete factual allegations tied to recognizable legal theories.  The complaint also specifies which individually named defendants were involved in which specific incidents.  The Court finds the complaint sufficient under Rule 8(a) to put the defendants on notice to the facts and claims asserted.  While the Court appreciates Defendants' concerns over whether the SAC is fit to "serve as the document that will define the issues and control the litigation and discovery in this matter," the Court does not find that these prudential concerns merit dismissal.  Dkt. No. 95 at p.8.  This order substantially narrows the live issues in the case and Defendants' discovery obligations will be so tailored.

### B.  State Law Claims

Plaintiff seeks to hold HARD liable under Cal. Gov. Code § 815.6 ("Liability for failure to discharge statutory duty") for injuries he has suffered due to HARD's alleged failure to enforce various park ordinances.  SAC at p.32.

#### 1.  Plaintiffs' State Law Claims Are Barred by the California Tort Claims Act

The California Tort Claims Act ("CTCA"), codified as California Government Code § 911.2, requires that "[a] claim relating to a cause of action [against public entities] . . . shall be presented . . . not later than six months after the accrual of the cause of action."  Cal. Gov. Code §

911.2.  This prerequisite is a mandatory condition precedent to filing suit and applies to state law claims for damages asserted against public entities.  *See Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995).  The claim filing requirement has been held applicable to claims including breach of statutory duties.  *Lozada v. City & Cty. of S.F.*, 145 Cal. App. 4th 1139, 1152 (Cal. App. 2006).

Plaintiff Barroca did not file any written claim within the prescribed period, so he may not pursue any of his state law claims against HARD as damages actions.  Plaintiff argues it was "unnecessary to comply" with the CTCA because his claims are constitutional in nature.  Dkt. No. 108 at 5.  Plaintiff does not allege any claims under the California constitution; he does appear to allege state law claims for breach of statutory duties under California Gov. Code Section 815.6. Such state claims are subject to the CTCA and must be dismissed for failure to comply with the CTCA.

2.  <u>Plaintiff's State Law Claims under California Government Code Section 815.6 Also Fail Because Plaintiff Does Not Show a Mandatory Duty</u>

Even if Plaintiff's state law claims were not barred by the CTCA, his state law claims could not proceed for failure to show that HARD violated a mandatory duty.

California public entities are typically immune to tort liability.  *Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1382 (Cal. 2010) (citing Cal. Gov. Code 815).  However, Section 815.6 provides a private right of action against a public entity that fails to discharge a mandatory duty. Cal. Gov. Code Section 815.6 ("Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.").  For liability to attach, the "enactment at issue be obligatory, rather than merely discretionary or permissive, in its directions to the public entity; it must require, rather than merely authorize or permit, that a particular action be taken or not taken."  *San Mateo Union High Sch. Dist. v. Cty. of San Mateo*, 213 Cal. App. 4th 418, 428 (Cal. App. 2013).  "It is not enough, moreover, that the

1   public entity or officer have been under an obligation to perform a function if the function itself

2   involves the exercise of discretion."  *Hacala v. Bird Rides, Inc*. 90 Cal. App. 5th 292, 305–306

3   (Cal. App. 2003).

4          Plaintiff argues that Cal. Pub. Resources Code § 5786.17(c) and HARD Ordinance 001-

5   003 Section 5 enact a mandatory duty for HARD rangers to enforce violations of park ordinances.

6   These enactments together provide:

> Cal. Pub. Resources Code § 5786.17(c):
> "To protect property and to preserve the peace at recreation facilities and other property owned or managed by a district, the board of directors may confer on designated uniformed district employees the power to issue citations for misdemeanor and infraction violations of state law, city or county ordinances, or district rules, regulations, or ordinances when the violation is committed within a recreation facility and in the presence of the employee issuing the citation. District employees **shall** issue citations pursuant to Chapter 5C (commencing with Section 853.5) of Title 3 of Part 2 of the Penal Code." (emphasis added).
>
> HARD Ordinance 001-003 Section 5:
> "In accordance with Public Resource Code section 5786.17, and to protect property and preserve the peace at recreation facilities and other property owned and managed by the District, the board of directors confers on District Park Rangers, the power to issue citations for misdemeanor and infraction violations of state law, city or county ordinances, or district rules, regulations, or ordinances when the violation is committed within a recreation facility and in the presence of the employee issuing the citation."

Plaintiff locates a mandatory duty in the language that district employees with the power to

issue citations, which include HARD rangers, "*shall* issue citations pursuant to Chapter 5C

(commencing with Section 853.5) of Title 3 of Part 2 of the Penal Code."  (emphasis added).

However, on a plain reading this sentence requires that when district employees issue citations, it

must be according to Chapter 5C of the penal code; it does not impose a mandatory duty to issue a

citation every time a violation is committed in the officer's presence.  Plaintiff also cites to a

HARD Ordinance which provides that HARD rangers have "the primary responsibility to enforce

these Regulations and other District rules as assisted by local law enforcement officers."  Dkt. No.

108 at 8.  But the fact that the rangers have the ability and responsibility to enforce their

regulations does not imply a mandatory duty to enforce in every instance.

United States District Court
Northern District of California

1        Because Plaintiff has failed to show that HARD had a mandatory duty to enforce any

2   particular park ordinances, HARD cannot be held liable under Section 815.6 and is immune from

3   suit for state law claims.  Plaintiffs' state law claims against HARD are dismissed.

4

5   **C.  Federal Claims under Section 1983**

6

7        1.  Qualified Immunity

8        "The doctrine of qualified immunity protects government officials from liability for civil

9   damages insofar as their conduct does not violate clearly established statutory or constitutional

10  rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231

11  (2009).  "Qualified immunity shields an officer from suit when she makes a decision that, even if

12  constitutionally deficient, reasonably misapprehends the law governing the circumstances she

13  confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  To determine whether a

14  government official is entitled to qualified immunity, a court should decide whether the facts that a

15  plaintiff has alleged make out a violation of a constitutional right, and if so, determine whether the

16  right at issue was "clearly established" at the time of the allegedly unconstitutional conduct.

17  *Pearson*, 555 U.S. at 232.  "Qualified immunity is applicable unless the official's conduct violated

18  a clearly established constitutional right." *Id.*  A right is not clearly established "unless the right's

19  contours were sufficiently definite that any reasonable official in the defendant's shoes would

20  have understood that he was violating it." *Manriquez v. Ensley*, 46 F.4th 1124, 1130-31 (9th Cir.

21  2022) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  "[T]he assertion of an affirmative

22  defense [such as qualified immunity] may be considered properly on a motion to dismiss where

23  the 'allegations in the complaint suffice to establish' the defense.'" *Sams v. Yahoo! Inc.*, 713 F.3d

24  1175, 1179 (9th Cir. 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

25        Plaintiff asserts various constitutional claims against HARD's rangers under Section 1983.

26  To succeed on any claim, he must not only plausibly allege that an officer violated a constitutional

27  right but also show that the right was "clearly established" at the time of the alleged violation.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

2. <u>Fourteenth Amendment Selective Enforcement</u>

The Supreme Court has recognized Fourteenth Amendment "equal protection claims brought by a 'class of one,' where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). To state such a claim "a class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects." *SmileDirectClub, Ltd. Liab. Co. v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022). There must be "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Id.* "Many courts have determined that this requirement should be enforced 'with particular strictness when the plaintiff invokes the class-of-one theory rather than the more settled cognizable-group theory.'" *Grant v. Corral*, No. 2:19-cv-01495-MCE-CKD (PS), 2021 U.S. Dist. LEXIS 41079, at *19 (E.D. Cal. Mar. 4, 2021) (citing *Warkentine v. Soria*, 152 F. Supp. 3d 1269, 1294 (E.D. Cal. 2016).

Plaintiff alleges that HARD rangers have enforced park ordinances against him while declining to do so against others. To state an equal protection claim, though, Plaintiff must satisfy the similarly situated requirement. At minimum, this means alleging that the same ordinance was enforced against him but not others for the same conduct. Most of Plaintiff's alleged selective enforcement does not meet this standard. Plaintiff alleges that the rangers enforced an ordinance prohibiting feeding wild or feral animals against him for feeding the neighborhood cats but does not allege that HARD declined to enforce this ordinance against a different parkgoer who was feeding the cats (or some other animal that the HARD rangers consider wild or feral).[2] *See* SAC p. 33, 35 Claim 2 & 4. Plaintiff also alleges that HARD rangers failed to enforce park ordinances relating to open fires and alcohol against other parkgoers but does not allege that the rangers enforced these ordinances against him. *See* p. 33, Claim 3. That HARD rangers enforced certain

_____

[2] Plaintiff argues that HARD improperly applied the feral animal ordinance because the cats he fed were not "feral or wild animals." Whether or not Plaintiff is correct is irrelevant to his selective enforcement claims, which turns on whether he has been treated differently than others in a similar situation.

United States District Court
Northern District of California

1  ordinances against Plaintiff while failing to enforce *different* ordinances against other parkgoers

2  does not satisfy the similarly situated requirement.

3  However, Plaintiff does allege that he was cited for violating HARD Ordinance 19(a),

4  which prohibits off-leash pets and leashes over six feet, but that the HARD rangers decline to

5  enforce this ordinance against others.[3]  Plaintiff provides extensive allegations that HARD rangers

6  do not generally enforce the leash ordinance against parkgoers, despite Plaintiff's frequent calls

7  and complaints.  *See e.g.*, SAC ¶ 26 (over 2,700 videos and pictures "most of them of off-leash

8  dogs); *id.* ¶ 29 (alleging that HARD rangers frequently witness dogs running off-leash but take no

9  action); *id.* ¶¶ 60-61 (alleging Plaintiff recorded HARD rangers showing up, witnessing off-leash

10  dogs, and taking no action).  Plaintiff also alleges that Ordinance 19(a) has been enforced against

11  him.  On August 31, 2023, Plaintiff alleges that HARD Ranger Fitzpatrick cited him for having

12  cats off-leash.  SAC ¶¶ 45-46.  On September 11, 2023, Ranger Fitzpatrick again approached

13  Plaintiff while he was petting cats in the park to cite him for violating the leash ordinance.  *Id.* ¶

14  50.  She told him Plaintiff that he was "the only one in the park that wasn't compliant" with the

15  leash ordinance.  *Id.*  While Plaintiff was arguing with Ranger Fitzpatrick over whether Ordinance

16  19(a) only applies to dogs, a dog-owner joined the conversation.  *Id.*  ¶¶ 51-54.  He had his dog on

17  a leash longer than 20 feet, in facial violation of Ordinance 19(a).  *Id.* ¶ 53.  Ranger Fitzpatrick

18  ignored this alleged violation, even after Plaintiff called it to her attention.  *Id.* ¶¶ 54-56.  Plaintiff

19  alleges that Ranger Fitzpatrick chose to enforce the leash ordinance against him, but not others,

20  because she held animus against him due to his repeated confrontations with her former co-worker

21  Mr. Hernandez.  *Id.* ¶ 52.  Drawing all inferences in favor of Plaintiff, Plaintiff has thus alleged

22  that despite the rangers' general policy of not enforcing Ordinance 19(a) against parkgoers, on two

23  occasions Ranger Fitzpatrick enforced this ordinance against Plaintiff – in one interaction,

24  declining to enforce the same ordinance against another parkgoer committing the same violation at

25  the same time – and that the reason for this difference in treatment was personal animus toward

26

27  ---

[3] Ordinance 19(a) provides that "All pets shall be restrained at all times on a leash or device no
28  more than 6 feet in length and under the complete control of the pets' owner or person in
possession of the pet, except when in District designated off-leash areas."  SAC, Ex. B.

1    Plaintiff.

2         Of course, Ranger Fitzpatrick's enforcement of the leash ordinance against Plaintiff in both

3    instances concerned cats, and the non-enforcement that Plaintiff identifies concerns dogs. But

4    HARD has not argued that the difference between a cat and a dog is "material" to the enforcement

5    of the "all pets" leash law. Plaintiff has sufficiently alleged for the pleading stage that there is "an

6    extremely high degree of similarity between [himself] and the persons to whom [he] compare

7    [himself]." *SmileDirectClub, Ltd. Liab. Co.*, 31 F.4th at 1123.

8         HARD has not pointed, in its briefing or in argument, to any rational basis for the alleged

9    difference in treatment. Rather, Defendant reiterates that "HARD park rangers are not employed

10   by Plaintiff Barroca to only respond to Plaintiff's requests immediately and ignore that numerous

11   other parks serviced and patrolled by HARD park rangers." Dkt. No. 111 at 3. HARD's argument

12   would be well taken if Plaintiff's allegations of non-enforcement of the leash laws concerned only

13   a lack of ranger presence or failure to respond promptly (or at all) to his calls, and if the rangers

14   applied this non-enforcement of the leash law to Plaintiff as well. But Plaintiff alleges that even

15   HARD rangers already present in the park and witnessing off-leash dogs did not enforce the leash

16   ordinance. And Plaintiff specifically alleges that Officer Fitzpatrick enforced the leash ordinance

17   against him but not a dog-owner also violating the same rule in the same encounter.

18        Plaintiff's allegations of selective enforcement of Ordinance 19(a) are sufficient to state a

19   claim against Ranger Fitzpatrick. Plaintiff, however, does not state a claim as to any other HARD

20   rangers on this count.

21        The Court must consider whether qualified immunity provides a defense for Ranger

22   Fitzpatrick. It does not. The defense of qualified immunity is not typically available when a

23   plaintiff's claim is based on intentional discrimination. *See Gutierrez v. Mun. Court of Se.*

24   *Judicial Dist.*, 838 F.2d 1031, 1050-51 (9th Cir. 1988) ("[A] government official is not entitled to

25   qualified immunity from a Section 1981 or 1983 action that is based on a claim of intentional

26   discrimination.") *vacated on mootness grounds*, 490 U.S. 1016 (1989); *Barich v. City of Cotati*,

27   No. 21-cv-00034-EMC, 2021 U.S. Dist. LEXIS 61141, at *3 (N.D. Cal. Mar. 30, 2021)

28   ("[Q]ualified immunity is not ordinarily available when the plaintiffs allege a claim which requires

United States District Court
Northern District of California

1  intentional discrimination which, if proven, would clearly constitute a constitutional violation.").

2  The gist of the equal protection claim here is that Ranger Fitzpatrick purposefully singled out

3  Plaintiff for adverse treatment compared to others who were similarly situated – *i.e.* intentional

4  discrimination.

5       Moreover, the law of class-of-one discrimination was clearly established in *Village of*

6  *Willowbrook v. Olech*, 528 U.S. 562 (2000), which held that a government official cannot

7  purposefully single out individuals and treat similarly situated individuals differently without a

8  rational basis, even if the plaintiff does not belong to a particular protected group.  The Ninth

9  Circuit "consistently read[s] *Olech* broadly as clearly establishing the right to be free from

10  differential treatment by the state without a rational basis."  *Ohana Control Sys. v. City & Cty. of*

11  *Honolulu*, No. 22-15956, 2023 U.S. App. LEXIS 15994, at *3 (9th Cir. June 26, 2023) (mem.)

12  (affirming denial of motion to dismiss class-of-one claim and rejecting qualified immunity

13  defense).

14       Ranger Fitzpatrick is not entitled to qualified immunity on the equal protection claim.

15  HARD's motion to dismiss the Fourteenth Amendment claim is **DENIED** as to Defendant

16  Fitzpatrick but **GRANTED** as to all other Defendants.

17

18     3.  <u>First Amendment Claims</u>

19      *a.  Free Exercise*

20       "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under

21  the Free Exercise Clause so long as they are neutral and generally applicable."  *Fulton v. City of*

22  *Phila.*, 593 U.S. 522, 533 (2021) (declining to overturn *Emp't Div. v. Smith*, 494 U.S. 872, 882

23  (1990)).[4]  The Supreme Court has rejected the argument that "when otherwise prohibitable

24  conduct is accompanied by religious convictions, not only the convictions but the conduct itself

25  must be free from governmental regulation."  *Smith*, 494 U.S. at 882.  A neutral and generally

26

27  _____

28  [4] In *Fulton*, the Court held that a law is not neutral and generally applicable when the state
provides a "mechanism for individualized exemptions," and "refuse[s] to extend that system to
cases of 'religious hardship'."  *Fulton*, 593 U.S. at 535 (citing *Smith*, 494 U. S., at 884).

applicable law is evaluated under the rational basis standard.  *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015); *accord Bacon v. Woodward*, No. 22-35611, 2024 U.S. App. LEXIS 14759, at *4 (9th Cir. June 18, 2024) (mem.).  Under rational basis, a law must be upheld if it is "rationally related to a legitimate governmental purpose."  *Stormans,* 794 F.3d at 1084.  Plaintiff has "the burden to negative every conceivable basis which might support [the rule]," *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993) (internal quotation marks omitted).

Plaintiff alleges that under his Catholic faith and the teachings of St. Francis of Assisi, he believes he has "a duty to God to take care of and love all of God's animals."  SAC ¶ 41.  Due to these religious beliefs, Plaintiff "takes care of, feeds, shelters, provides medical needs, spay and neuters, play, love, and protect these cats and all of God's animals."  *Id.* ¶ 42.[5]  HARD's Ordinance 19(b) provides that "Feeding feral or wild animals or depositing feed for feral or wild animals is prohibited."  SAC, Ex. B.  Plaintiff has alleged that this park ordinance interferes with his ability to feed cats within Meek Park, thus burdening his religious duty to take care of animals, specifically, the cats that frequent Meek Park.

HARD Ordinance 19(b) is neutral and generally applicable.  Any burden it places on Plaintiff's ability to exercise his religious beliefs in caring for animals is incidental.  Since the law is neutral and generally applicable, Plaintiff must show that it is not rationally related to any conceivable legitimate government purpose.  But there are many potential legitimate bases for the rule: for example, feeding wild or feral animals attracts them to the park, increasing the risk of conflict with parkgoers and their pets, and the spread of disease.  Since the rule has a conceivable legitimate basis, Plaintiff's free exercise claim fails.  [6]

### b.  Retaliation

Under the First Amendment to the United States Constitution, a citizen has the right to be

---

[5] HARD does not challenge the sincerity or validity of Plaintiff's religious beliefs in its briefing. Since it is outside "the judicial function and judicial competence" to act as "arbiters of scriptural interpretation," the Court accepts Plaintiff's religious beliefs as sincerely held for the purpose of this claim.  *United States v. Lee*, 455 U.S. 252, 257 (1982).
[6] Plaintiff does not plausibly allege that Defendants were aware of his personal religious beliefs and took action purposefully to suppress those beliefs.

1    free from governmental action taken to retaliate against the citizen's exercise of First Amendment

2    rights or to deter the citizen from exercising those rights in the future. *Sloman v. Tadlock*, 21 F.3d

3    1462, 1469-70 (9th Cir. 1994). "A plaintiff may bring a [§] 1983 claim alleging that public

4    officials, acting in their official capacity, took action with the intent to retaliate against, obstruct,

5    or chill the plaintiff's First Amendment rights." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824

6    F.3d 858, 867 (9th Cir. 2016). "To bring a First Amendment retaliation claim, the plaintiff must

7    allege that (1) [he] engaged in constitutionally protected activity; (2) the defendant's actions

8    would 'chill a person of ordinary firmness' from continuing to engage in the protected activity;

9    and (3) the protected activity was a substantial or motivating factor in the defendant's conduct—

10   i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Id.*

11   Conduct that chills speech may take the form of threatening or causing pecuniary harm,

12   withholding a license, right, or benefit, prohibiting the solicitation of charitable donations,

13   detaining or intercepting mail, or conducting covert surveillance of church service. *Id.* at 868.

14   "[A] plaintiff need only show that the defendant 'intended to interfere' with the plaintiff's First

15   Amendment rights and that it suffered some injury as a result; the plaintiff is not required to

16   demonstrate that its speech was actually suppressed or inhibited." *Id.* at 867. The Ninth Circuit

17   has recognized circumstantial evidence of retaliatory intent or motive may be established by "(1)

18   proximity in time between protected speech and the alleged retaliation; (2) the defendant

19   expressed opposition to the speech; or (3) other evidence that the reasons proffered by the

20   defendant for the adverse action were false and pretextual." *McCollum v. California Dep't of*

21   *Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (cleaned up); *Watison v. Carter*, 668 F.3d

22   1108, 1114 (9th Cir. 2012) ("Because direct evidence of retaliatory intent rarely can be pleaded in

23   a complaint, allegation of a chronology of events from which retaliation can be inferred is

24   sufficient to survive dismissal."). By the same logic, a significant gap between the protected

25   activity and the alleged retaliation can merit a finding of no retaliation. *Keyser v. Sacramento City*

26   *Unified Sch. Dist.*, 265 F.3d 741, 752 (9th Cir. 2001).

27

28

United States District Court
Northern District of California

17

i.   *Conversation with Property Manager*

In one retaliation claim, Plaintiff alleges that an unknown individual from HARD phoned the property manager of Plaintiff's girlfriend, Ms. Gomes, and informed him that Plaintiff "had created and was involved in multiple incidents in the Park that this person represented and was considered a nuisance." SAC at p. 41.  The property manager told Ms. Gomes that if the information was true and the behavior persisted, it "could affect her tenancy negatively, meaning that she could be evicted." *Id.*  The property manager "made clear that he was not filing an eviction at this time" but that it could be "a possibility in the future" and stated that "it would be a good idea if she [Ms. Gomez] restricted Mr. Barroca from visiting her." *Id.*

Plaintiff argues that this conduct was in retaliation for Plaintiff's civil lawsuit against HARD.  But Plaintiff fails to show a sufficient nexus between HARD's action and an intent to chill Plaintiff's protected speech.  Plaintiff filed this lawsuit in January of 2025 but alleges that HARD did not contact his girlfriend's property manager until July of 2025. Dkt. No. 1; SAC at p.41.  This five-month gap is insufficient to support an inference of retaliation, and Plaintiff pleads no other facts that indicate the call was motivated by Plaintiff's lawsuit, as opposed to his ongoing interactions with the HARD rangers.  *See Keyser*, 265 F.3d at 752 (9th Cir. 2001) (observing that a three-month gap was an insufficient temporal nexus to support retaliation).  Plaintiff thus cannot state a claim for retaliation based on this incident.

Moreover, the alleged retaliatory conduct was not sufficient to chill protected conduct. Negative comments to a property manager are not something that likely would adversely affect Plaintiff.  It is several steps removed.  The only conduct Plaintiff has alleged is badmouthing by HARD.  While Plaintiff alleges that HARD's speech led his girlfriend's property manager to raise the possibility of eviction, this injury – which has not materialized – is not to Plaintiff and Plaintiff does not show how it would chill his ability to conduct his lawsuit.  *Nunez v. City of L.A.*, though arising in the employment retaliation context, is instructive.  In *Nunez*, the Plaintiff had shown only that that "he was bad-mouthed and verbally threatened" by his government employer but otherwise suffered no injury or adverse action. 147 F.3d 867, 875 (9th Cir. 1998).  The Ninth Circuit held that this conduct was insufficient to state a claim, observing that "[i]t would be the

18

1    height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment

2    violation. *Id.* In *Coszalter v. City of Salem*, the Ninth Circuit reiterated that "minor acts" such as

3    "badmouthing," even if occurring in response to protected speech, do not violate the First

4    Amendment. 320 F.3d 968, 976 (9th Cir. 2003).

5         Plaintiff cannot show that the retaliatory conduct he alleges was sufficient to chill speech.

6    Certainly, any such claim was not clearly established and thus qualified immunity would apply.

7

8         *ii.    Filming Incident*

9         Plaintiff also asserts a First Amendment claim based on an incident in which a park ranger

10   told him to stop filming a family barbecue held by Marco Hernandez, a retired HARD employee.

11   SAC ¶¶ 18, 34.

12        The Ninth Circuit has "recognized that there is a First Amendment right to film matters of

13   public interest." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018).  A

14   well-established application of this right is recording the official conduct of police and other

15   public officials in public spaces. *See e.g.*, *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035,

16   1044 (9th Cir. 2018) (stating that "[t]he First Amendment protects the right to photograph and

17   record matters of public interest," which "includes the right to record law enforcement officers

18   engaged in the exercise of their official duties in public places"); *see also Fields v. City of*

19   *Philadelphia*, 862 F.3d 353, 355-356 (3d Cir. 2017) (stating that "the First Amendment protects

20   the act of photographing, filming, or otherwise recording police officers conducting their official

21   duties in public"); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First

22   Amendment protects the right to gather information about what public officials do on public

23   property, and specifically, a right to record matters of public interest"); *Glik v. Cunniffe*, 655 F.3d

24   78, 83 (1st Cir. 2011) (holding that "the First Amendment protects the filming of government

25   officials in public spaces").

26        Here, Plaintiff alleges that he noticed Mr. Hernandez, a retired HARD employee who lives

27   in the caretaker's house in the park, hosting a family and friends barbecue in a public area next to

28   the caretaker's house. SAC ¶ 34, 18.  Plaintiff alleges that Mr. Hernandez and his guests were

1    violating numerous park ordinances, including having a fire, drinking and serving alcohol, and

2    using a fenced-off yard for his guests. *Id.* ¶ 34.  Plaintiff started filming from 150 yards away. *Id.*

3    Ten minutes later, Ranger Oliver arrived and ordered Plaintiff to stop filming. *Id.* ¶ 35.  When

4    Plaintiff refused to stop videotaping, Ranger Oliver called the Alameda County Sheriffs and told

5    them there had been an altercation. *Id.* ¶ 36.  Plaintiff does not allege that he was arrested.

6           Plaintiff fails to satisfy the first prong of First Amendment retaliation – that he was

7    engaged in protected First Amendment conduct.  While the First Amendment protects filming

8    public officials in the exercise of their duties, Mr. Hernandez was not a public official and was not

9    engaged in any public duty.  As to the more general rule that the First Amendment protects

10   filming matters of public interest, Plaintiff provides no authority that a family barbecue in a public

11   park is a matter of public interest, whether or not Plaintiff suspects that barbecue violates park

12   ordinances.  The Court does not find that the barbecue, as alleged by Plaintiff, constitutes a matter

13   of public interest.  Plaintiff has not stated a claim on this count.

14          Further, any such claim would be barred by qualified immunity since the right alleged is

15   not "clearly established." *Saved Magazine v. Spokane Police Dep't*, 19 F.4th 1193, 1198 (9th Cir.

16   2021); *Powelson v. Sausalito Police Dep't*, No. 23-cv-01360-EMC, 2025 U.S. Dist. LEXIS

17   174051, at *21 (N.D. Cal. Sep. 7, 2025) (dismissing First Amendment retaliation claim on

18   qualified immunity grounds because pro se Plaintiff had "not cited any authority to support his

19   position that his filming of documents inside a law enforcement vehicle is constitutionally

20   protected activity, a predicate to a claim of retaliation").

21          Furthermore, Ranger Oliver's conduct was not sufficient to chill speech.  In the police

22   filming context, the Ninth Circuit has recognized arrest without probable cause is an adequate chill

23   to satisfy the second prong of First Amendment retaliation.  *See Adkins v. Limtiaco*, 537 F. App'x

24   721, 722 (9th Cir. 2013) (*citing Beck v. City of Upland*, 527 F.3d 853, 870-71 (9th Cir. 2008); *see

25   also White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (holding that informal measures such as an

26   investigation can chill First Amendment activities).  In *Green v. Bd. of Regents of the Univ. of

27   Cal.*, a district court considered a First Amendment claim where the officer "simply [] order[ed] a

28   citizen to stop filming, with no further threat of arrest or harm."  2021 U.S. Dist. LEXIS 252311,

United States District Court
Northern District of California

1    at *10 (C.D. Cal. Oct. 22, 2021).  Finding no controlling case law supporting a claim on that basis,

2    the court held that a person of "ordinary firmness" "would not be deterred from videotaping

3    merely because officers ordered him to stop, particularly since Plaintiff continued filming after"

4    being told to stop.  *Id.*

5        Here, Ranger Oliver did not arrest Plaintiff for his filming.  She arguably *tried* to get him

6    arrested, but since park rangers lack the power to do more than give citations, this meant calling

7    the police as any private citizen might have done in response to unwelcome recording.  Ranger

8    Oliver did not control whether the police arrested Plaintiff for his filming and, indeed, the police

9    did not decide to do so.  In fact, in a different encounter Plaintiff alleges that the Alameda deputies

10   told the park rangers and Plaintiff that he had a right to film in the park.  Moreover, it is not clearly

11   established that a park ranger who lacks the power to make arrests calling the police, who

12   ultimately make no arrest, satisfies the chilling prong of First Amendment retaliation.  Both

13   substantively and as a matter of qualified immunity, Plaintiff's First Amendment claim fails.

14       HARD's motion to dismiss Plaintiff's First Amendment claims is **GRANTED** as to all

15   Defendants.

16

17       4.  Fourth Amendment – Provision of False Information

18       An officer may be liable under § 1983 for false statements submitted in support of a search

19   warrant in violation of the Fourth Amendment.  *Butler v. Elle*, 281 F.3d 1014, 1024–26 (9th Cir.

20   2002).  To state a claim, a plaintiff must show that the investigator 'made deliberately false

21   statements or recklessly disregarded the truth in the affidavit' and that the falsifications were

22   'material' to the finding of probable cause."  *Galbraith v. County of Santa Clara*, 307 F.3d 1119,

23   1126 (9th Cir. 2002).

24       Plaintiff asserts that that Ranger Oliver provided false information to law enforcement that

25   resulted in a search of Plaintiff and Ms. Gomes' house.  SAC at p.36-37.  On January 30, 2024, the

26   police were called after Plaintiff stabbed a man in Meek Park.  Dkt. No. 63 at 5; SAC at p.36.

27   Plaintiff alleges that at this time Ranger Oliver told the police that Plaintiff "resided as a house

28   that Barroca frequented, his girlfriend Raelynn Gomes house."  SAC at p.37.  Plaintiff alleges that

Ranger Oliver knew this information was false because she was "familiar with Barroca" and "knew Barroca's actual address as reflected on his driver's license." *Id.* Plaintiff further alleges that this "false information" caused Plaintiff's probation officers to search Ms. Gomes' house on May 30, 2024. *Id.*

The Court previously considered the search of Ms. Gomes' house in adjudicating Plaintiff's Fourth Amendment Bivens claim against his probation officer Ghishan. On May 17, Officer Ghishan filed a Petition for Warrant for Person Under Supervision that alleged that "Barroca changed his address to the Hayward residence without informing Probation . . . [based on] the Alameda County Sheriff's Office Incident Report #24-001486, which revealed Mr. Barocca is known by . . . (HARD) Rangers [along with] prior law enforcement contacts with Mr. Barroca [to reside in] 16922 Harvard Avenue in Hayward, CA." Criminal Matter Dkt. No. 983 at 3-4. This Court thereafter "[found] there [was] probable cause to believe there has been a violation of the conditions of supervision" and ordered issuance of a no-bail arrest warrant. Dkt. No. 63 at 5. Plaintiff argued in his claim against Officer Ghishan that "Ghishan had no legitimate reason to be at Gomes's residence other than based on the misinformation provided by Ranger Oliver and therefore no probable cause to search the Hayward residence." *Id.*

However, this Court found that "[e]ven when viewing the facts in the light most favorable to Plaintiffs, the record reflects ample evidence to support Officer Ghishan's search of what she believed was Plaintiff Barroca's residence." *Id.* at 8 (citing Amend. Compl. at 25–26, Dkt. No. 12 [Plaintiff Barroca was repeatedly absent from his registered address in Belmont], *id.* [Plaintiff conceding that his conduct may have created a "false impression" that he lived at a different location to Officer Ghishan]), Mot. to Dismiss Amend. Compl. at 9, Dkt. No. 35 [Officer Ghishan explaining that while surveilling Meek Estate Park on May 30, 2024, they observed Plaintiff in the park in the morning but had not observed him driving to Ms. Gomes house that morning]; Criminal Matter at Dkt. No. 1020 ¶¶ 11-12 [when Mr. Barroca was arrested he had possession of a door key to the house]).

On this record, Plaintiff cannot show that Ranger Oliver's comment that Plaintiff resided at Ms. Gomes house was deliberately false or made with reckless disregard for the truth. Plaintiff's

only basis for this assertion is that Ranger Oliver knew the address listed on Plaintiff's driver's license and on prior citations to Plaintiff.  SAC ¶ 75; p.37.  But Plaintiff's own allegations demonstrate that he was very visible in Meek Park: he visited the park twice a day every day, and he repeatedly called and encountered HARD rangers there, including Ranger Oliver.  Since Ranger Oliver had ample reasons to believe that Plaintiff was actually living by the park, despite what it said on his papers, her comment to the police was not "deliberately false: or made with "reckless disregard for the truth."  Indeed, Plaintiff himself refers to the Hayward residence in his complaint as "Plaintiff and Co-Plaintiff's Raelynn Gomes house."  SAC at p.36 (sic).  Plaintiff's claim for false support of an arrest warrant under the Fourth Amendment is **DISMISSED**.

### D.  Raelyn Gomes Is Dismissed as a Plaintiff

HARD argues that Plaintiff Raelyn Gomes lacks standing to sue HARD.  Dkt. No. 95 at 8; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  For a party to have standing, "[T]here must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'"  *Id.*  The only claim that hints at injury to Ms. Gomes by HARD is the incident in which HARD rangers apparently called her property manager, who then told her that eviction could be a "possibility" if "these types of complaints are true and persist."  SAC at p. 41.  Given that Ms. Gomes has not been evicted, this injury is speculative.  Any injury would also be based on the independent action of her property manager, posing difficulty for causation.  Further, no relief Plaintiff seeks could redress the hypothetical possibility of Ms. Gomes' property manager deciding to evict her based on the information HARD provided.  The court has no basis to enjoin Ms. Gomes' property manager from evicting her if he is unhappy with Mr. Barroca's presence at the Hayward residence.  *See Iran Thalassemia Soc'y v. Office of Foreign Assets Control*, No. 3:22-cv-01195-HZ, 2023 U.S. Dist. LEXIS 77022, at *24 (D. Or. May 1, 2023) ("[W]here a court order directed at a defendant will not grant the plaintiffs relief absent decisions by third parties not bound by that order, courts regularly find that the plaintiff has failed to establish redressability.").

1    In addition to lack of standing, Ms. Gomes has failed to participate in this lawsuit.  While

2    Plaintiff Barroca has submitted many filings and responses on his and Ms. Gomes' behalf,

3    Plaintiff Barroca is not a lawyer and may not file on Ms. Gomes' behalf or otherwise represent her

4    in court.  *See* 28 U.S. Code § 1654.  Under Fed. R. Civ. P. Rule 41, the Court may dismiss a

5    plaintiff for failure to prosecute.  This action was filed over a year ago and contains over one

6    hundred filings; in that time, Ms. Gomes has not submitted any filings independently of Plaintiff

7    Barroca.  She also did not appear at the January 26, 2026 hearing held on this motion, despite

8    HARD moving to dismiss her claims.

9        The Court therefore **DISMISSES** Ms. Gomes from this action and **DISMISSES** all claims

10    she purports to assert.  The Court notes that Plaintiff has realleged a claim for violation of the

11    Fourth Amendment arising from Probation Officer Ghishan's May 30, 2024 search of the

12    Hayward residence.  SAC at p.41, Claim 7.  The Court previously dismissed this claim with

13    prejudice.  Dkt. No. 63 at 10.  This claim is accordingly **STRICKEN**.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

IV.    **CONCLUSION**

HARD's Motion to Dismiss is **DENIED** as to Plaintiff's Fourteenth Amendment claim for selective enforcement against Ranger Fitzpatrick; HARD's Motion to Dismiss is otherwise **GRANTED** on all counts and as to all defendants.  The claims are dismissed with prejudice.

The Court also **DISMISSES** Raelyn Gomes as a Plaintiff, along with any claims she purports to assert in this action.

Plaintiff's improperly realleged Fourth Amendment claim against Probation Officer Ghishan is **STRICKEN**.

For the clarity of the parties, the only live claim that now remains in this action is a single count under Section 1983 for Fourteenth Amendment Selective Prosecution against Ranger Fitzpatrick.  At the 1/29/2026 hearing, the Court deferred the initial case management conference pending the outcome of HARD's motion to dismiss.  The Court now sets an initial case management conference for March 17, 2026 at 1:30 by Zoom.

**IT IS SO ORDERED**.

Dated: 2/23/2026

_____
EDWARD M. CHEN
United States District Judge